**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED FARM WORKERS OF AMERICA, | ) Case No.: 1:18-cv-0134 - JLT |
| Plaintiff, | ) ORDER DENYING PLAINTIFF'S MOTION FOR |
| | ) SUMMARY ADJUDICATION (DOC. 33) |
| v. | ) |
| | ) ORDER GRANTING DEFENDANT'S MOTION |
| HUDSON INSURANCE COMPANY, | ) FOR SUMMARY JUDGMENT (DOC. 26) |
| Defendant. | ) |
| | ) |

United Farm Workers of America asserts that Hudson Insurance Company failed to honor its insurance coverage obligations by failing to defend UFW in a class action filed by Francisco Cerritos, a former employee. UFW contends Hudson is liable for breach of contract and breach of the implied covenant of good faith and fair dealing. (*See generally* Doc. 2-2) UFW seeks summary adjudication under Rule 56 of the Federal Rules of Civil Procedure only on the issue that Hudson had a contractual duty to defend in the Cerritos action. (Doc. 33) Hudson contends UFW is unable to succeed on its claims and seeks summary judgment. (Doc. 26)

The Court heard the oral arguments of the parties on April 4, 2019. For the reasons set forth below, UFW's motion for summary adjudication is **DENIED** and Hudson's motion for summary judgment is **GRANTED**.

///

///

# I.    Background and Undisputed Facts[1]

Hudson issued Labor Professional Liability Insurance Policy No. SUL31210038-01 ("the Policy") to named United Farm Workers of America, with a policy period of September 7, 2013 to September 7, 2014.[2]  (JSF 1; Doc. 31-1)  In return, UFW paid Hudson an annual premium of $14,379.  (PSF 2)  Under the Policy[3], UFW and Hudson agreed:

> The Insurer shall pay on behalf of the Insured all Loss for which the Insured becomes legally obligated to pay resulting from any Claim first made against the Insured during the Policy Period, … *which results from a Wrongful Act, Wrongful Offense or Wrongful Employment Practice* and which is subsequently reported to Hudson within the earlier of: a) ninety (90) days or b) by the end of the Policy Period, the Automatic Reporting Period or the Extended Reporting Period (whichever is applicable).

(PSF 37; Doc. 31-1 at 4) (emphasis added) The Policy included definitions for "Wrongful Act," which described acts related to duties owed by the union to its members, "Wrongful Employment Practice," which listed ten acts related to duties owed by union management to its own employees, and "Wrongful Offense," which related to personal injuries caused by union employees and management.  The policy language was:

> **Wrongful Act** means any error or omission or beach of duty committed or alleged to have been committed by the Union or any Insured Person in the discharge of his or her duties solely in his or her capacity as an Insured Person for the Union.  Wrongful Act includes, but is not limited to:
> 1. The fair representation of all Union members,
> 2. Any Union election,
> 3. The denial of Union membership to anyone,
> 4. The recruitment of new Union members,
> 5. The disciplining or expulsion of any Union members,
> 6. The processing of any Union member's grievance,
> 7. The financial management of the Union, or
> 8. Discrimination and denial of fair access to Member benefits.
>
> **Wrongful Employment Practice** means any:
> 1. Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of any implied contract;
> 2. Harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);
> 3. Discrimination, (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference,

---

[1] The parties filed a "Joint Statement of Undisputed Facts" on March 7, 2019.  (Doc. 27)  Facts from this document are identified as "JSF." Undisputed facts taken from UFW's Separate Statement of Factors (Doc. 33-4) are identified as "PSF," while undisputed facts taken from Hudson's Separate Statement (Doc. 32) are identified as "DSF".

[2] The Joint Statement of Facts indicates the policy period ran from September 9, 2013 through September 9, 2014.  (JSF 1)  However, the Policy indicates it was effective from September 7, 2013 through September 7, 2014.  (Doc. 31-1 at 2)

[3] The Policy identifies any defined terms in bold text.  The Court has removed the emphasis from the original text, except where necessary for clarity.

pregnancy or disability);
4. Retaliation (including lockouts);
5. Employment-related misrepresentation(s) to an Employee or application for employment with the Union;
6. Employment-related libel, slander, humiliation, defamation, or invasion of privacy;
7. Wrongful failure to employ or promote;
8. Wrongful deprivation of career opportunity, wrongful demotion or negligent Employee evaluation, including the giving of negative or defamatory statement in connection with an Employee reference;
9. Wrongful discipline; or
10. Failure to provide or enforce adequate or consistent policies and procedure relating to any Wrongful Employment Practice.

**Wrongful Offense** means any Personal Injury committed or alleged to have been committed by the Union or any Insured Person in the discharge of his or her duties solely in his or her capacity as an Insured Person.

(Doc. 31-1 at 16-17, 19 [Third Party EPL Coverage Endorsement]) (emphasis omitted)

Under Section III of the Policy, which governs "Defense and Settlement," Hudson and UFW agreed to the following:

The Insured, and not the Insurer, shall have the duty to defend Claims against him. The Insurer will advance, excess of any applicable Deductible Amount, Claims Expenses for Claims to which this policy provides coverage, subject to the Insured's agreement to repay the Claims Expenses in the event and to the extent that there is no coverage for such Claims or Claims Expenses under the policy.

The Insured shall have the right to select counsel to defend any covered Claim, subject to the consent of the Insurer, which shall not be unreasonably withheld, and subject to the selected counsel's agreement to comply with the litigation guidelines set forth by the Insurer for the defense of covered Claims. The Insurer shall have the right and shall be given the opportunity, at any time, to effectively associate with the Insured in the investigation, defense and[] settlement of any Claim covered by this policy, by giving notice to the Insured of such election. The Insurer's obligation to pay any Loss shall cease upon exhaustion of the applicable Limit(s) of Liability as stated in ITEM 5 of the Policy Certificate.

The Insurer may, with the written consent of the Insured, make any settlement or compromise of a Claim we deem appropriate. Such consent shall not be unreasonably withheld. If the Insured withholds such consent to any settlement for any reason, our liability for all Loss with respect to that Claim shall not exceed the amount for which we could have settled such Claim plus Claims Expenses accrued as of the date the Insured refused to consent to settlement as recommended by the Insurer, subject to the applicable Limit(s) of Liability as stated in ITEM 5 of the Policy Certificate.

The Insured shall not settle any Claim, make any settlement offer, incur any Claims Expenses or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Insurer's written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any settlement, Claims Expenses, assumed obligations or admissions to which it has not consented.

If both Loss covered by this policy and loss not covered by this policy are incurred, either because a Claim against an Insured includes both covered and uncovered

3

matters or because a Claim is made against both an Insured and others, the Insureds and the Insurer shall allocate such amount between covered Loss and uncovered loss based upon the relative exposures of such parties to such manners.

(Doc. 31-1 at 5)

On May 16, 2013—about four months before Hudson issued the Policy—UFW terminated Francisco Cerritos from its employment. (JSF 2) "His termination resulted in protests and picketing at the UFW offices by others demanding his reinstatement." (DSF 15) On May 22, 2013, "UFW filed a lawsuit for breach of contract against Cerritos and others in the Monterey County Superior Court, *United Farm Workers of America v. La Union Es Para Todos Staff Union*, Monterey County Superior Court Case No. M123292."[4] (DSF 16) In the complaint, UFW asserted the picketing "violated a 'No Strike Clause' of the collective bargaining agreement between plaintiff and La Union and sought an injunction to enforce that clause." (DSF 17) The parties agreed to use the grievance procedure under the collective bargaining agreement for the substantive issues presented in the action. (Martinez Decl. ¶ 35-1 at 2, ¶¶ 5-6) Despite this, the matter remained pending in the California Court of Appeals until February 2015 when it decided an issue related to the disqualification of the staff union's counsel.[5] (*See* DSF 18; Martinez Decl. ¶ 35-1 at 2, ¶¶ 5-6)

On February 19, 2014, Cerritos served UFW with a letter pursuant to Labor Code section 2999.3 claiming that the UFW misclassified Cerritos and other employees as exempt employees." (JSF 3; *see also* Doc. 31-2 at 3-4) The following week, "UFW tendered the Cerritos letter to Hudson for 'coverage/defense.'" (JSF 4; Doc. 31-2 at 2) Hudson denied coverage related to the letter on March

---

[4] Hudson requests that the Court take judicial notice of the complaint in Case No. M123292, which was filed by UFW and names Francisco Cerritos as a defendant. (Doc. 30 at 3; Doc. 30-1 at 2) UFW does not oppose the request or dispute these facts. (*See* Doc. 35-5 at 8)

The Court may take judicial notice of a fact that "is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The records of court proceedings cannot reasonably be questioned, and judicial notice may be taken of a court's record. *See Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (explaining that courts may judicially notice documents on file in federal or state courts); *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D. Cal. 1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981). Accordingly, the Court may take judicial notice of the filing of the complaint, as well the identity of the parties. To that extent, Defendant's request for judicial notice of the complaint, identified as "Exhibit H," is **GRANTED**.

[5] Hudson requests that the Court take judicial notice of the decision issued by the California Court of Appeals on February 27, 2015. (Doc. 30 at 3) The court may take judicial notice of another court's opinion, "not for the truth of the facts recited therein, but for the existence of the opinion." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001); see also *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) ("the authenticity and existence of a particular order… or judicial proceeding… is a matter of public record" and thus judicially noticeable). Thus, Hudson's request for judicial notice of the issuance of the opinion of the Court of Appeal is **GRANTED**.

27, 2014. (JSF 5) UFW was informed that Hudson did not have a duty to defend or indemnify "because the Cerritos Letter [did] not allege a Wrongful Act, Wrongful Offense, or Wrongful Employment Practice as defined in the Policy." (Doc. 31-3 at 2)

On May 2, 2014, Cerritos filed a complaint in the Monterey County Superior Court, alleging UFW was liable for: "(1) failure to pay overtime wages; (2) Violation of California Labor Code for failing to provide and/or pay for meal periods; (3) Knowing and Intentional Failure to Comply with Itemized Employee Wage Statement Provisions; (4) Failure to Pay All Wages Upon Termination; (5) Wrongful Discharge; (6) Violation of the Labor Code Section 2698; and (7) Unfair Business Practices." (JSF 6) In Paragraph 16, as part of his "General Allegations," Cerritos alleged:

> On or about September 2012, Plaintiff was a founding member of the La Union Es Para Todos Union ("LUEPTSU"). LUEPTSU was founded by UFW employees and continues representing UFW employees today. As a result of Plaintiff's participation in LUEPTSU, Defendant retaliated against Plaintiff by initiating unwarranted disciplinary action as a pretext for terminating Plaintiff's employment on May 2, 2013.

(Doc. 31-4 at 6, ¶ 16) Paragraph 39 contained within the Wrongful Discharge cause of action reads, "As a result of Plaintiff's participation in LUEPTSU beginning in mid-2012, Defendant retaliated against Plaintiff by initiating unwarranted disciplinary action as a pretext for terminating Plaintiff's employment on May 2, 2013 in retaliation for Plaintiff [sic] activities related to LUEPTSU and for Plaintiff's complaints to the National Labor Relations Board regarding Defendant's unlawful conduct." (Doc. 31-4 at 9)

In support of the third cause of action related to failure to provide itemized employee wage statement provisions in violation of Labor Code §§ 226, 1174 and Wage Order No 4-2001, Cerritos also alleged:

> 31. Since on or about January 2010, Defendant consistently, willfully and intentionally failed to provide Plaintiff with complete and accurate wage statements. Among other things, Defendant failed to include [the] total number of hours worked by Plaintiff, overtime hours worked, meal period premiums owed and other required information.

> 32. Plaintiff has suffered injury as a result of Defendant's violation of California Labor Code §§ 226(a), 1174 and IWC Wage Order No. 4-2011. The injury and damage to Plaintiff includes deceiving Plaintiff about the wages and other compensation he was entitled to and the denial of his legal right to receive an accurate wage statement.

(Doc. 31-4 at ¶¶ 31-32) UFW tendered this complaint to Hudson, "with a request for its position on

5

coverage." (JSF 7)

On June 13, 2014, Hudson issued a letter to UFW in which it "outline[d] the extent and availability of coverage for the Cerritos Complaint under the Policy." (Doc. 31-5 at 2) In doing so, Hudson noted that Cerritos alleged "UFW retaliated against him by initiating disciplinary action as a pretext for terminating him." (Doc. 31-5 at 3) Hudson indicated its belief that "six of the seven causes of Action … do not allege a Wrongful Employment Practice as defined in the policy," but "the fifth Cause of Action of Action of the Cerritos Complaint – Wrongful Discharge – appear[ed] to meet the policy definition of Wrongful Employment Practice." (*Id.* at 4-5) Hudson agreed to "provide a defense to the Cerritos Complaint," "subject to a reservation of rights." (JSF 8; Doc. 31-5 at 3) In addition, Hudson instructed UFW to "report all major developments send all requests for fee reimbursements" to its Chief Claims Officer.[6] (PSF 14) Hudson and UFW "agreed to a 50/50 allocation of Claims Expense." (JSF 9)

"On October 24, 2014, the trial court in the Cerritos lawsuit issued an order granting the UFW's motion to compel arbitration as to the 5th cause of action for wrongful termination." (JSF 10) However, the claim was never arbitrated. (Doc. 26 at 28)

More than a year later on November 16, 2015, Cerritos filed a First Amended Complaint, in which purported to represent a class of similarly situated individuals and eliminated the cause of action for wrongful termination based upon retaliation (*See* Doc. 31-4 at 5, ¶ 8; DSF 65; *see also* JSF 11). The First Amended Complaint included the following causes of action: (1) failure to overtime wages in violation of Cal. Labor Code §§ 510, 1194 and (Wage Order 4-2001); (2) failure to provide proper meal periods in violation of Cal. Labor Code §§ 226.7 and 512(a); (3) failure to provide itemized wage statements in violation of Cal. Labor Code §§ 226, 1174; (4) penalties under Labor Code § 203; (5) the Private Attorney General Act of 2004; (6) violations of Cal. Business & Professions Code §§ 17200 *et seq.*; and (7) failure to provide wage information in violation of Cal. Labor Code § 226(e). (JSF 11; *see also* Doc. 31-7 at 2-15) Plaintiff's allegations in Paragraphs 16, 31, and 32— related to wrongful

---

[6] Evidently, there are two versions of the June 13, 2014 letter. The version attached to the "Joint Appendix of Exhibits" does not include language directing UFW to send its requests for fee reimbursements to Hudson's claims officer. (*Compare* Doc. 31-5 at 5- 6 *with* Doc. 33-2 at 9) Nevertheless, Hudson indicates it is "[u]ndisputed that the reservation of rights letter generally stated words to that effect. (Doc. 37 at 10)

termination and the accuracy of the wage statements— were unchanged in the First Amended

Complaint.  (*Compare* Doc. 31-4 ¶¶ 16, 31-32 *with* Doc. 31-7 ¶¶ 16, 31-32)

Hudson issued a "Supplemental Reservation of Rights" letter on July 5, 2016.  (JSF 12; Doc.

31-8 at 2) Hudson indicated that, subject to a reservation of rights, it would "continue to advance

Claims Expenses, and subject to the terms and conditions of the Policy and the prior agreement as to

allocation."  (Doc. 31-8 at 2, emphasis omitted)  At the same time, "Hudson specifically denie[d] any

duty to provide any indemnity coverage for this wage and hour matter."  (*Id.* at 3) Hudson noted that

Paragraph 16 related to retaliation remained in the First Amended Complaint but observed "Cerritos did

not re-file his prior cause of action for wrongful discharge."  (*Id.* at 3, 5) Hudson observed also:

> The first amended complaint does not seek any damages or relief with respect to the
> alleged retaliation or termination, and seeks relief and damages solely for violations of
> the California Labor Code and a private attorney general action under California
> Business and Professions Code Sec. 17200 et seq., including restitution, injunctive
> relief, injunctive relief, unpaid wages, civil penalties, interest and attorneys' fees.

(*Id.* at 3; *see also id.* at 5)  Hudson indicated its belief that "[n]o Wrongful Act or Wrongful Offense …

[was] alleged in the first amended class action complaint." (*Id.* at 4)  In addition, Hudson informed

UFW that it believed Cerritos did "not allege any Wrongful Employment Practice," as defined in the

Policy, in his amended complaint.  (*Id.* at 5)

UFW "submitted the first request for Hudson for payment of any Claims Expense" on January

27, 2017.  (DSF 73; Doc. 35-5; *see also* Doc. 28-2 at 2)  "UFW's counsel Thomas Lynch agreed to

certain reductions from his defense bills for charges that were outside of Hudson's litigation guidelines

for counsel." (DSF 74)  After voluntary deductions and with "the agreed 50/50 allocation," Mr. Lynch

requested reimbursement in the amount of $125,195.73 from UFW.  (DSF 75)  Hudson applied the

Policy's $25,000 deductible to the request, and "paid UFW $100,195.72 for Claims Expense."  (DSF

77; *see also* PSF 27)

"The Cerritos lawsuit went to trial on February 27, 2017." (JSF 13)  The court found for the

plaintiffs, awarding $1,120.489.60 against UFW.  (JSF 14; *see also* Doc. 31-9 at 20)  The award

included damages for: (1) Plaintiff's individual claim for overtime; (2) Plaintiff's individual meal

period claim; (3) and PAGA penalties (and/or restitution) for failure to provide meal periods, non-

compliant wage statements, and unpaid overtime.  (Doc. 31-9 at 20)  "On May 5, 2017, following a

noticed motion for attorney fees, the trial court assessed an additional $772,394.00 against UFW for attorney fees and costs." (PSF 18) "The amounts of the judgments in the Cerritos matter were ultimately reduced to $1.3 million by way of settlement." (PSF 28)

On June 29, 2017, "Hudson issued a letter denying any obligation for coverage of the award and withdrawing from payment of defense expense." (JSF 15, Exh. 10; Doc. 31-10) Specifically, counsel for Hudson informed UFW:

> After a review of Judge Willis' Statement of Decision and Judgment, Hudson has determined that there is no potential of coverage under the Policy for the First Amended Complaint ("FAC"), because neither the FAC nor Statement of Decision allege or discuss a Wrongful Act, Wrongful Offense or Wrongful Employment Practice as defined in the Policy. Additionally, multiple Policy exclusions apply to preclude coverage. Accordingly, Hudson hereby withdraws from [UFW's] defense of the Cerritos Action and will not advance Claims Expense[s] incurred after the FAC was filed. Additionally, Hudson specifically reserves the right to seek reimbursement of any Claims Expenses advanced since the filing of the FAC.

(Doc. 13-10 at 2) Hudson did not reimburse any additional costs of defense following the payment of $100,195.73. (*See* PSF 27)

UFW initiated this action on December 19, 2017, by filing a complaint for breach of contract and breach of the implied covenant of good faith and fair dealing in Kern County Superior Court, Case No. BCV-17-102912-TSC. (Doc. 2-2 at 2) Hudson filed its answer on January 19, 2018.[7] (Doc. 35-7 at 2). As an affirmative defense, Hudson alleged: "There is no obligation for insurance coverage because the Plaintiff has failed to comply with conditions precedent and subsequent." (*Id.* at 8, ¶14) In addition, Hudson alleged there was no obligation "because coverage was precluded by the applicable insuring agreements, definitions, conditions, limitations and exclusions of Hudson's policy and/or by public policy or provisions of law," and the claims presented against UFW were not covered losses. (*Id.* at 8, ¶¶ 16-17)

The parties filed the cross-motions for summary judgment now pending before the Court on March 7, 2019. (Doc. 26; Doc. 33)

///

---

[7] UFW requests that the Court take judicial notice of the answer filed by Hudson in Kern County Superior Court. (Doc. 35-7) Hudson does not oppose this request. Plaintiff's request is **GRANTED**, and the Court takes judicial notice of the filing date and the affirmative defenses presented in the Answer. The Court refuses to take judicial notice of the truth of the allegations. *See Edison Co.,* 300 F. Supp. 2d at 974 (observing the "veracity and validity" of allegations in a pleading are not subject to judicial notice).

8

## II. Evidentiary Objections

Hudson requests the Court take judicial notice of the dockets in Case Numbers 31-CB-31-CB-092517 (filed November 2, 2012); 32-CA-096501 (filed January 15, 2013); 32-CA-107850 (filed June 24, 2013); and 32-CA-107876 (filed June 24, 2013) of the National Labor Relations Board, which were filed against UFW. (*Id.* at 3; Doc. 33-3)

UFW opposes the request for judicial notice, asserting that the information provided in the printout of the dockets by Hudson "is not an undisputed matter of public record, nor a document on file in federal or state court." (Doc. 35-8 at 2) In addition, UFW contends the exhibit filed by Hudson has "not been authenticated… to come into evidence." (*Id.*)

Importantly, judicial notice does not require authentication of documents. *See Flake v. Arpaio,* 2018 U.S. Dist. LEXIS 88176 at *3 (D. Az. May 25, 2018) (explaining valid judicial notice requires neither the record itself or a witness to authenticate the record). Instead, judicial notice is appropriate where the fact "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

With the requirements of Rule 201 in mind, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007). This is particularly true of information on government agency websites, which courts have often found proper subjects for judicial notice. *See, e.g., Gerritsen v. Warner Bros. Enter. Inc.,* 112 F. Supp.3d 1011, 1033 (C.D. Cal. 2015) ("the court can take judicial notice of [p]ublic records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies"); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (observing courts "routinely take notice of information contained on state and federal government websites"); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of approval by the National Mediation Board published on the agency's website).

Because the National Labor Relations Board is a federal agency, the Court may take judicial notice of information provided on its website, including public filings and the filing dates. *See Magic Laundry Servs. v. Workers United SEIU*, 2013 WL 1409530 at *1 (C.D. Cal. Apr. 8, 2013) (finding

judicial notice of public filings with the NLRB was "proper because they are matters of public record not subject to reasonable dispute"); *see also Overby v. Int'l Longshore & Warehouse Union Local Chapter Eight,* 2018 WL 7200662 at *2 (D. Or. Dec. 14, 2018) (taking judicial notice of an unfair labor practice claim filed with the NLRB, because it was "a matter of public record and not reasonably subject to dispute"). Accordingly, UFW's objections to the request for judicial notice and the evidence related to the filing of complaints with the NLRB are **OVERRULED**.[8]

### III.    Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics,* 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the

---

[8] Despite UFW's objection to the information related to the NLRB complaints, Mr. Martinez admits in his declaration that there had been more than one "so-called complaint" made to the NLRB and that one was active at the time of the application for the insurance coverage at issue. (Doc. 35-1 at 2-3)

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence.[9] *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

---

[9] To the extent that statements offered by either party are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. *See Burch v. Regents of the Univ. of Cal.*, 453 F.Supp. 2d 1110, 1119 ("statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and … will not be considered on a motion for summary judgment") (citation omitted, emphasis in original). Rather, the Court's analysis cites evidence only that it has deemed admissible.

## IV.     Interpretation of Insurance Contracts

In an action founded on diversity jurisdiction, the Court must apply state law to interpret an insurance policy. *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008). California determines that "interpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995); *see also Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 925-26 (9th Cir. 2003) ("the interpretation of contract language is a question of law"); *State Farm Fire & Casualty Co. v. Lewis*, 191 Cal.App.3d 960, 963 (1987) ("interpretation of an insurance policy, like any other contract, is a matter of law as to which a reviewing court must make its own independent determination"). "The interpretation of a contract, including the resolution of any ambiguity, is solely a judicial function unless the interpretation turns on the credibility of extrinsic evidence." *Am. Alternative Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1245 (2006) (citations omitted).

Under the rules of contract interpretation, "the mutual intention of the parties at the time the contract is formed governs interpretation." *Hervey v. Mercury Cas. Co.*, 185 Cal. App. 4th 954, 961 (2010) (quoting *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821-22 (1990)). The Court "should give the words used their plain and ordinary meaning, unless the policy clearly indicates to the contrary." *Giddings v. Industrial Indemnity Co.*, 112 Cal.App.3d 213, 218 (1980). "Where contract language is clear and explicit and does not lead to an absurd result, [the court] ascertain[s] this intent from the written provisions and [will] go no further." *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 372 (2001), citing Cal. Civ. Code §§ 1638, 1639; *see also Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264 (1992) (if a policy's language is "clear and explicit, it governs").

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Powerine Oil Co. v. Superior Court*, 37 Cal. 4th 377, 390 (2005) (internal quotation marks omitted). To determine ambiguity, the Court first considers whether, in light of the extrinsic evidence, the language is "reasonably susceptible" to the interpretation urged. *Hervey*, 185 Cal. App. 4th at 961-62.  In general, "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted against the insurer." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (citation, internal

quotations marks omitted)  Thus, "ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations." *E.M.M.I. Inc. v. Zurich Am. Ins.*, 32 Cal.4th 465, 470 (2004) (citation omitted)

**V.     Discussion and Analysis**

UFW seeks summary adjudication on the issue of a duty to defend under the Policy.  (Doc. 33) Hudson seeks summary judgment on all claims, asserting it did not have a duty to defend UFW under the Policy, and there was no coverage for the claims alleged in Cerrito's First Amended Complaint.  In addition, Hudson contends the Policy is void due to misrepresentations by UFW in its application for the Policy.  (Doc. 26)

**A.     Duty to Defend**

As an initial matter, the parties disagree whether there was a "duty to defend" imposed by the terms of the Policy.  In determining whether a duty to defend exists, the Court refers to the policy, the complaint and all facts known to the insurer. *See Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (Cal. 1993).

UFW asserts there was a duty to defend under the Policy "[b]ecause there was 'potential' or 'possible coverage under the Policy, Hudson fell under a duty to defend as a matter of law" (Doc. 33-3 at 11, emphasis omitted). According to UFW, under California law, "a duty to defend is imposed whenever the insurer ascertains facts which give rise to the *possibility* of coverage." (*Id.*, citing *Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co*., 76 Cal. App. 3d 272, 278 (1977))  UFW contends that "Hudson itself recognized the potential for coverage under the Policy because it confirmed as much when it accepted UFW's tender of defense." (*Id.* at 12) In support of its assertion that Hudson breached a duty to defend, UFW also cites *Buss v. Superior Court*, 16 Cal. 4th 35, 65 (1997), which held an insurer "must defend immediately," and "[t]o defend immediately, it must defend entirely." (Doc. 33-3 at 13)  UFW contends Hudson unlawfully withdrew its defense and "shirked its duty to defend meaningfully and entirely." (*Id.*, emphasis omitted)

Hudson argues the Policy did not include a duty to defend and instead imposed only "a duty to advance defense expenses for covered claims." (Doc. 26 at 25)  Hudson observes that when an insurance "policy only promises to advance Claims Expense for covered claims, the insurer is not

13

required to pay Claim Expenses (or Loss) for uncovered Claims." (*Id.*, citing *Jeff Tracy, Inc. v. U.S. Specialty Ins. Co.*, 636 F.Supp.2d 995, 1003-04 (C.D. Cal. 2009)). Hudson contends this duty is "more akin to the duty to indemnify than the duty to defend." (*Id.*, quoting *Clark v. Travelers Casualty Ins. Co. of America*, 2015 WL 5096418 (C.D. Cal. 2015)) As such, Hudson asserts "the standard to be applied here is not '*potential* for coverage,' but *actual* coverage." (*Id.* at 25, emphasis added)

In response, UFW again cites *Buss v. Superior Court*, 16 Cal. 4th 35, 46 (1997), for support that the Policy required a duty to defend once UFW made tender for coverage. (*See* Doc. 35 at 11-13) The court held that, in a "mixed" action where some claims were at least potentially covered, the insurer had a duty to defend the entire "mixed" action and could not "parse the claims" between those potentially covered and uncovered. *Buss*, 16 Cal. 4th at 48-49, 59. Importantly, however, Buss involved a commercial general liability insurance policy that *expressly* provided that the insurer had the "duty to defend any suit against Buss seeking damages…". *Buss*, 16 Cal. 4th at 41 (internal quotation marks omitted). Thus, the guidance of *Buss* does not apply here because the parties agreed in the policy that the duty to defend was to be borne by UFW.

Courts recognize that the duty to defend and the duty to advance costs are conceptually distinct, and the duties may result in different obligations under an insurance policy.[10] *See Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.,* 471 F.3d 961, 970 (9th Cir. 2006), citing *Helfand v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 10 Cal.App 4th 869, 879 (1992) (observing an insurer may not be obligated "to provide the insured with a defense" under a policy, because the duty to defend was distinct from a duty "to reimburse the insured for defense costs as an ingredient of 'loss,' a defined term under the policy"). In *Gon v. First State Ins. Co.*, the Ninth Circuit determined the district court

---

[10] California courts have found similarly. In *Health Net, Inc. v. RLI Ins. Co.*, 206 Cal.App.4th 232, 259 (2012), as modified on denial of reh'g (June 12, 2012), the court held,

> In D&O policies, there is generally no duty to defend clause. Instead, defense costs are defined as part of "Damages" for which indemnification is to be paid. [Footnote] (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2011) ¶ 7:514, p. 7B-7 (rev. # 1, 2011).) In that situation, the "contractual language limits reimbursement to costs incurred in the defense of claims that would be insurable under the [p]olicies." (*Pan Pacific Retail Properties, Inc. v. Gulf Ins. Co.* (9th Cir.2006) 471 F.3d 961, 970.) **In other words, in the absence of a contractual duty to defend, when defense costs are recoverable only as covered losses, only those defense costs which were actually related to the defense of covered claims may be reimbursed.**

(Emphasis added, footnote omitted)

14

erred in finding the insurance policy imposed a duty to defend and found instead "no language in the policy stating First State will defend any claims." *Id.*, 871 F.2d 863, 867-68 (9th Cir. 1989). The Court observed:

> A policy with a duty to defend typically contains a clause that provides that the insurer chooses the attorney and controls the strategy of the litigation, a valuable right to protect the insurer's own interests. This clause is not present in the First State policy. Instead, the First State policy covers legal expenses as a loss item. Directors and officers liability policies generally do not contain a duty to defend. *See* Comment, *Practical Aspects of Directors' and Officers' Liability Insurance - Allocating and Advancing Legal Fees and the Duty to Defend*, 32 UCLA L. Rev. 690, 701-12 (1985).

*Gon*, 871 F.2d at 868. Thus, the Court determined there was not a "duty to defend" under the policy, though it found a duty "to pay defenses as incurred." *Id.*

Following *Gon*, the Central District rejected an insured's argument that a "duty to defend" standard governed a policy where the policy "clearly and conspicuously disclaim[ed] the duty to defend. *Jeff Tracy, Inc.*, 636 F.Supp.2d at 995 (C.D. Cal. 2009). The policy placed the obligation to defend claims on the insured because it read, "the 'Insureds,' not USSIC, 'must defend any Claim against them.'" *Id*. at 1003.

Just as UFW argues here, in *Jeff Tracy*, the insured argued that "disclaimers notwithstanding, the duty to defend or 'potential for coverage' standard" under California law is the proper standard to determine the insurer's obligations under the policy. *Jeff Tracy, Inc.* at 1003. The court rejected this argument and explained:

> [I]mposing a duty to pay all defense costs once a potential for coverage is shown runs contrary to the terms of the policy. Under Condition D, the "Insureds," not USSIC, "must defend any Claim against them." (Compl., Ex. 1 at 44.) Jeff Tracy is barred from admitting liability, stipulating to any judgment, or incurring any Defense Cost without USSIC's prior approval. (Id.) "Only those settlements, stipulated judgments, and Defense Costs to which the Insurer has consented will be recoverable as Loss under the Policy." (Id.) The parties also agreed to allocate Loss payments when a Claim involves both covered and uncovered Loss. (Id.) And if the parties "are unable to agree upon an allocation, then until a final allocation is agreed upon or determined . . . the Insurer will be obligated to make an interim payment of that amount or portion of Loss, including Defense Costs, which the parties agree is not in dispute." (Id.) Thus, USSIC's duty to pay Defense Costs is tempered by Jeff Tracy's obligation to provide its own defense, obtain USSIC's approval before incurring Defense Costs, and to allocate between covered and uncovered Defense Costs. These conditions are not consistent with the broader duty to defend standard.

*Jeff Tracy*, 636 F.Supp.2d at 1003-04. The court observed: "[R]ather than paying premiums for the right to a defense of all potentially covered claims, Plaintiff in this case paid (presumably lower)

15

premiums for a lesser right…. To require Defendant to advance all of Plaintiff's defense costs on a current basis despite … the parties' contrary intent would give Plaintiff an un-bargained-for windfall." *Id.* (citation omitted). Thus, when the "duty to defend standard does not apply," to demonstrate a breach of duty under the insurance contract, "Jeff Tracy must establish that the underlying claims are within the basic scope of coverage. If Jeff Tracy meets its burden, USSIC must demonstrate that the claims are specifically excluded. If Jeff Tracy is unable to meet its burden, or if USSIC successfully establishes that an exclusion applies, USSIC did not breach its obligations under the D & O Policy and is entitled to judgment in its favor." *Id.* at 1004.

Similarly, in *Peterson v. Columbia Cas. Co.*, 2012 WL 5316352 at * 7 (C.D. Cal. Aug. 21, 2012), the policy specifically provided that the insured, not the insurer, was obligated to defend against claims. *Peterson* observed that "rules applying to interpreting or establishing a duty to defend are not applicable for a duty to advance claims expenses." *Id.* at *9. The court observed the policy in issue "provide[d] for claims expenses to be advanced subject to several conditions," including:

> [T]he policy provides that ASSUREDS must consult with the Insurers about incurring reasonable defense costs, the ASSUREDS must get Insurer consent prior to making any settlement or settlement offers, the parties must allocate defense expenses proportionally to covered and uncovered matters, the insurer must advance expenses only according to that allocation, and the Insurer may unilaterally set an allocation if one cannot be agreed upon. (Policy §V.3.a-e (as amended by the Policy Endorsement).)

*Id.* at *9-10. With these conditions and an "explicit disclaimer of any duty to defend," the *Peterson* court found the policy was "not consistent with the broader duty to defend." *Id.* at *10. As a result, the court declined to apply the "potential for coverage" standard, instead finding Peterson had "the burden of establishing 'that the underlying claims are within the basic scope of coverage.'" *Id.*, quoting *Jeff Tracy*, 636 F.Supp.3d at 1004.

UFW contends the Court should decline to follow the reasoning in *Jeff Tracy* and should apply the "potentially covered" standard set forth in *Legacy Partners, Inc. v. Clarendon American Ins.*, 2010 LEXIS 36966, 2010 WL 1495198 (S.D. Cal. Apr. 14, 2010). (Doc. 35 at 18) UFW observes that in *Legacy Partners*, "the court found that the policy at issue did not impose a duty to defend on the insurer but rather placed it on the insured itself," but was "liable for all 'alleged damages' that were 'potentially covered.'" (*Id.* at 18, citing *Legacy Partners*, 2010 WL 1495198) In so holding, the court

16

observed:

> The Policy does not refer to proven damages or actual damages. It refers to alleged damages. Allegations, by their nature, are not facts; they are assertions that may, if proven, eventually become facts. In other words, allegations have the potential to become facts. Thus, if the damages alleged in the Wellington Suit are potentially covered by the Policy, then Defendant must pay for the litigations costs in defense of that suit. This interpretation of the Policy adheres to California law's requirement that the court interpret a policy's coverage broadly in order to provide the greatest possible protections to the insured. *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648, 3 Cal. Rptr. 3d 228, 73 P.3d 1205 (2003).

*Legacy Partners*, 2010 WL 1495198 at *4. Notably, the Southern District recognized that the policy before the court in *Legacy Partners* was distinguished from the policy addressed in *Jeff Tracy*. *See id.*, 2010 WL 1495198 at *6. Rejecting the defendant's argument against the potentiality standard, the court opined:

> *Jeff Tracy* does not support Defendant's position for three reasons. First, the court in *Jeff Tracy* merely placed the burden on the insured to "establish that the underlying claims are within the basic scope of coverage," *id.*, and then analyzed the allegations in the underlying complaint to determine whether they alleged covered losses, *id.* at 1004-05. The Court here has similarly placed the burden on Plaintiff to show that the damage allegations in the Wellington Suit are potentially covered by the Policy. So, the holding in *Jeff Tracy* is not materially different from the holding here.
>
> Second, the policy in *Jeff Tracy* is not like the one here. That policy required the insurer to consent to any defense costs as a condition for reimbursement. It also allocated defense costs between covered and uncovered claims. And the insurer in that case did not have the right to participate in the defense of a case. The Policy here is different on all of these counts. Thus, the holding regarding the D&O policy in *Jeff Tracy* in inapplicable to the Policy here.
>
> And third, the court in *Jeff Tracy* did not actually address the issue before the Court. It only addressed whether the duty-to-defend standard applied to the D&O policy. *Id.* at 1003-04. Here, the parties do not dispute that the duty-to-defend standard does not apply. Instead, they dispute whether the potentiality standard applies to a policy imposing a duty to pay defense costs.

*Id.*, 2010 WL 1495198 at *6 (emphasis added). In contrast to *Legacy Partners,* the policy here required Hudson to consent to defense costs and to allocate costs between covered and uncovered losses. Unlike here, in *Legacy Partners* the parties agreed the duty-to-defend standard did not apply, so the court was not called upon to define the parameters of this duty. Thus, *Legacy Partners* does not assist UFW with its assertion that the Court should apply the "duty to defend" standard or the "potential" coverage test.

Like the policies addressed in *Gon, Jeff Tracy*, and *Peterson*, Hudson disclaimed the duty to defend, and the Policy clearly indicated that "[t]he Insured, and not the Insurer, shall have the duty to

defend Claims against him." (Doc. 31-1 at 5) The Policy required Hudson to "advance, excess of any applicable Deductible Amount, Claims Expenses for Claims to which this policy provides coverage, subject to the Insured's agreement to repay such Claims Expenses in the event and to the extent that there is no coverage for such Claims or Claims Expenses under this policy." (*Id.*) The Policy did not include a clause providing the insurer would choose the attorney or control the strategy of the litigation, which are "typically" found in a "duty to defend" policy. *See Gon*, 871 F.2d at 868. Instead, the Policy indicated the insured had the right to select counsel and, though Hudson could associate in counsel to work with UFW's attorney, the policy does not allow Hudson to replace UFWs counsel or to control the litigation strategy. (Doc. 31-1 at 5) Similar to the policy in *Jeff Tracy*, the policy here required UFW to provide its own defense and to submit claims to Hudson for covered losses, to allocate defense costs for covered and uncovered losses and it determined that Hudson would "not be liable for any settlement, Claims Expenses, assumed obligations or admissions to which it has not consented." (*Id.*; *see also Jeff Tracy*, 636 F.Supp.2d at 1003-04) Finally, unlike in *Legacy Partners*, the policy does not make Hudson liable for "alleged damages" but only for those damages UFW "becomes legally obligated to pay." (Doc. 31-1 at 15) Thus, the Court finds the terms of the Policy did not impose a "duty to defend" on Hudson but a duty to advance Claims Expenses for covered claims. *See Jeff Tracy*, 636 F.Supp.2d at 1003-04; *Gon*, 871 F.2d at 868.

## B. Coverage under the Policy

When, as here, an insured "seek[s] reimbursement after the underlying litigation has settled and no longer need to worry about the assertion of new types of claims or damages, [the insured] must show that the expenses at issue were related to claims that actually fell within the basic scope of coverage." *Pan Pac. Retail Props.*, 471 F.3d at 970-71. Accordingly, UFW has the burden to show the claims in the Cerritos action were *actually* covered by the Policy. *See id.*; *see also Jeff Tracy*, 636 F.Supp.2d at 1004 (where there is a duty to advance claims expenses, the insured "must establish that the underlying claims are within the basic scope of coverage"); *Aydin Corp. v. First State Ins. Co.*,18 Cal. 4th 1183, 1188 (1998) (in a breach of contract action by the insured against its insurance company, "the burden is on [the] insured to establish that the occurrence forming the basis of [the] claim is within the basic scope of insurance coverage"). If UFW meets this burden, the burden shifts to Hudson to

18

demonstrate the claims are excluded under the Policy.  *Jeff Tracy*, 636 F.Supp.2d at 1004.

### 1.    Insuring agreement

Under the terms of the policy, the parties agreed: "The Insurer shall pay on behalf of the Insured all Loss for which the Insured becomes legally obligated to pay resulting from any Claim first made against the Insured during the Policy Period… which results from a Wrongful Act, Wrongful Offense or Wrongful Employment Practice…" (Doc. 31-1 at 4)  Thus, the claim must result from a Wrongful Act, Wrongful Offense, or Wrongful Employment Practice as defined by the Policy.

Hudson asserts the Policy did not cover the loss incurred by UFW.  (Doc. 26 at 18-25) According to Hudson, "Once the cause of action for wrongful discharge was dismissed, there no longer was any coverage, either actual or potential." (Doc. 36 at 15)  Hudson maintains the claims alleged in the First Amended Complaint, "and for which UFW ultimately was found liable[,] do not constitute 'Wrongful Acts' or 'Wrongful Employment Practices' under the Policy." (Doc. 26 at 18) On the other hand, UFW argues there is coverage under the Policy under its provisions for both "Wrongful Acts" and "Wrongful Employment Practices."  (Doc. 35 at 20-22)

### 2.    Wrongful Offenses

As an initial matter, no party argues the claims against UFW constitute "Wrongful Offenses," which include "any Personal Injury committed or alleged to have been committed by the Union or any Insured Person in the discharge of his or her duties solely in his or her capacity as an Insured Person." (Doc. 31-1 at 17; *see also* Doc. 26 at 18 ["There is no dispute that Mr. Cerrito's claims against UFW did not constitute 'Wrongful Offenses.'"]) Consequently, there was no coverage under this provision of the Policy.

### 3.    Wrongful Employment Practices

Under the Policy's "Third Party EPL Coverage Endorsement," "Wrongful Employment Practices" were defined as any:

1. Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of any implied contract;
2. Harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);
3. Discrimination, (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);
4. Retaliation (including lockouts);

5. Employment-related misrepresentation(s) to an Employee or application for employment with the Union;
6. Employment-related libel, slander, humiliation, defamation, or invasion of privacy;
7. Wrongful failure to employ or promote;
8. Wrongful deprivation of career opportunity, wrongful demotion or negligent Employee evaluation, including the giving of negative or defamatory statement in connection with an Employee reference;
9. Wrongful discipline; or
10. Failure to provide or enforce adequate or consistent policies and procedure relating to any Wrongful Employment Practice.

(Doc. 31-1 at 19) UFW contends there was coverage under this provision, because "[t]he Cerritos action alleged wrongful termination" and misrepresentation. (Doc. 35 at 21-22)

### a. Wrongful termination based on retaliation

The parties agree that "[t]he original complaint filed by Cerritos included a cause of action for wrongful termination in retaliation," which "was covered by the policy." (Doc. 35 at 21; *see also* Doc. 26 at 22) The parties disagree whether the First Amended Complaint included a claim for retaliation that is covered under this provision. UFW asserts that "retaliation remained a viable and actionable claim of the lawsuit against UFW" because "Paragraph 16 of the FAC continued to allege wrongful termination based on retaliation." (Doc. 35 at 21-22) Specifically, Paragraph 16 provided:

> On or about September 2012, Plaintiff was a founding member of the La Union es Para Todos Union ("LUEPTSU"). LUEPTSU was founded by UFW employees and continues representing UFW employees today. As a result of Plaintiff's participation in LUEPTSU, Defendant retaliated against Plaintiff by initiating unwarranted disciplinary action as a pretext for terminating Plaintiff's employment on May 2, 2013.

(Doc. 31-7 at 5, ¶ 16)

Hudson observes that despite the fact that Paragraph 16 remained unchanged in the amended complaint, the state court "granted the motion to compel arbitration as to the 5th cause of action, finding that Plaintiff's claim for wrongful termination did arise from the [collective bargaining agreement]." (Doc. 39 at 10, quoting Doc. 31-6 at 3) As Hudson concludes, due to the court's decision to compel arbitration, "there was not going to be any trial for wrongful discharge." (Doc. 39 at 10) Indeed, the allegations of Paragraph 16, under the section entitled "General Allegations," did not correspond to any claim alleged in the First Amended Complaint. No remaining cause of action addressed retaliation, unwarranted disciplinary actions, or wrongful termination; and no factual allegations supported the legal conclusion in Paragraph 16 that "Defendant retaliated against Plaintiff."

Even if it did, the state court's order referring the retaliatory wrongful termination claim to arbitration foreclosed Cerritos from pursuing it in that forum, and, of course, Cerritos abandoned it.[11]  Thus, the Court agrees there was not a potential for coverage for a retaliation claim by Cerritos— let alone actual coverage— set forth in the First Amended Complaint.

### b.  Misrepresentation

UFW and Hudson also disagree whether Cerritos alleged an "[e]mployment-related misrepresentation to an Employee" in his amended complaint.  UFW asserts, "The FAC alleged an affirmative misrepresentation of wages and other compensation owed to Cerritos and similarly situated employees, and those alleged misrepresentations were a legal element of the claims against UFW." (Doc. 35 at 22)  In particular, UFW quotes Paragraphs 31-32:

> 31.  Since on or about January 2010, Defendant consistently, willfully and intentionally failed to provide Plaintiff with complete and accurate wage statements. Among other things, Defendant failed to include the total number of hours worked by Plaintiff, overtime hours worked, meal period premiums owed and other required information.
>
> 32.  The injury and damage to Plaintiff includes deceiving Plaintiff about the wages and other compensation he was entitled to and the denial of his legal right to receive an accurate wage statement.

(*Id.* at 22, quoting Doc. 31-7 at 7, ¶¶ 31-32)  According to UFW, "Because misrepresentation, including concealment and intentional deceit formed the basis of one of the FAC's claims, actual coverage for the claim existed under the Policy."  (Doc. 35 at 22)

This Court previously rejected a similar argument in *California Dairies, Inc. v. RSUI Indemn. Co.*, 617 F.Supp.2d 1023 (E.D. Cal. 2009).  In *California Dairies*, the policy defined "Employment Practices Wrongful Act" as including "[e]mployment-related misrepresentation to an Employee or applicant for employment with the Insured organization" and "[f]ailure to provide or enforce adequate and consistent organization policies or procedures relating to employment." *Id.*, F.Supp.2d at 1049 (emphasis omitted).  The plaintiff argued that allegations "that employees were denied mandated meal periods, rest periods, reimbursement for employee uniforms, and wages due at termination, involve 'Employment Practices Wrongful Acts' because they 'reflect employment misrepresentations to

---

[11] It is particularly noteworthy that UFW makes no assertion and provides no evidence that any of its efforts in discovering or defending the *Cerritos* action involved pursuing paragraph 16.

employees that Plaintiff would comply with the law regarding such benefits,' and/or 'involve a failure to enforce adequate or consistent organizational polices relating to employment.'" *Id.*, 617 F.Supp.2d at 1049. The Court rejected this argument, stating:

> CDI's assertion that the [California Labor Code] violations alleged in the [underlying] complaint should be viewed as "employment-related misrepresentations" is a strained interpretation of the Policy language in light of the facts presented. The [underlying] action is limited to allegations based upon the failure to pay wages and related benefits. The [underlying]complaint does not allege any misrepresentations by CDI, nor is misrepresentation a required element of any of the [underlying] causes of action, all of which relate to wage and hour conditions of employment.
>
> The same conclusion applies to CDI's argument that the [underlying] allegations involve failures "to enforce adequate or consistent organization[al] polices relating to employment." The underlying complaint does not mention or concern internal organizational policies at CDI.

*Id.* at 1050. The Court granted summary judgment in favor of the insurer, and the Ninth Circuit affirmed the holding. *Id.* at 1051; *California Dairies, Inc. v. RSUI Indem. Co*., 462 Fed. App'x. 722, 723-724 (9th Cir. 2011). The Ninth Circuit agreed with the district court that "[t]he Underlying Action does not allege a failure to enforce organizational policies, and misrepresentation is not an element of any of the claims it alleges." *Id.*, 462 Fed. App'x at 723.

As in *California Dairies*, the allegations identified by UFW in the *Cerritos* First Amended Complaint relate to wage and hour violations under California labor laws. Despite UFW's assertion to the contrary, misrepresentation and deceit were not elements of any of the causes of action identified in the First Amended Complaint.[12] *See California Dairies*, 617 F.Supp.2d at 1027, 1049-50 (finding misrepresentation was not "a required element" of the California labor law claims presented in *Gonzalez*, including "1) failure to pay minimum wage; 2) failure to pay regular and overtime wages; 3) failure to provide mandated meal periods or pay an additional hour of wages; 4) failure to provide mandated rest periods or pay an additional hour of wages; 5) failure to reimburse employees for costs incurred to acquire and/or maintain company-required uniforms; 6) knowing and intentional failure to comply with itemized wage statement provisions; and 7) failure to timely pay wages due at

---

[12] As noted above, the causes of action included: (1) failure to overtime wages in violation of Cal. Labor Code §§ 510, 1194 and (Wage Order 4-2001); (2) failure to provide proper meal periods in violation of Cal. Labor Code §§ 226.7 and 512(a); (3) failure to provide itemized wage statements in violation of Cal. Labor Code §§ 226, 1174; (4) penalties under Labor Code § 203; (5) the Private Attorney General Act of 2004; (6) violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and (7) failure to provide wage information in violation of Cal. Labor Code § 226(e). (JSF 11; Doc. 31-7 at 2-15)

termination"). Thus, the Court finds UFW fails to identify a misrepresentation for which there was actual coverage under the Policy based upon the allegations in the *Cerritos* amended complaint.[13]

### 4. Wrongful Acts

Under the Policy's definitions, "Wrongful Acts" were defined as "any error or omission or beach of duty committed or alleged to have been committed by the Union or any Insured Person in the discharge of his or her duties solely in his or her capacity as an Insured Person for the Union." (Doc. 31-1 at 16, § IX(X)) In addition, the Policy provides:

> Wrongful Act includes, but is not limited to:
> 1. The fair representation of all Union members,
> 2. Any Union election,
> 3. The denial of Union membership to anyone,
> 4. The recruitment of new Union members,
> 5. The disciplining or expulsion of any Union members,
> 6. The processing of any Union member's grievance,
> 7. The financial management of the Union, or
> 8. Discrimination and denial of fair access to Member benefits.

(*Id.*)

UFW contends that the denial from Hudson in March 2014 related to the initial Cerritos letter "made no mention of 'Wrongful Acts,' which are not enumerated in the Policy but are left open by the phrase 'includes but is not limited to.'" (Doc. 33-3 at 8) In addition, UFW asserts Hudson's letter in May 2017 "provided no discussion whatsoever as to why the Cerritos (sic) claims did not implicate coverage for 'Wrongful Acts.'" (*Id.* at 14) UFW argues there was a *potential* for coverage because "the FAC alleged UFW's 'misclassification' of employees, a claim potentially covered as a Wrongful Act, which the Policy defines as 'any error or omission or breach of duty committed or alleged to have been committed by [UFW].'" (*Id.* at 10, 14 [modification in original])

Hudson asserts the "includes but is not limited to" argument advanced by UFW "violates the 'evident object' rule of contract interpretation..." (Doc. 39 at 9, citing Cal. Civ. Code § 1648; *AIU Ins. Co. v. Superior Court*, 51 Ca1. 3d 807, 827- 828 (1990)) Hudson observes that under California law, "[t]he ordinary rules for contract interpretation require a consideration of the contract wording as a whole, with all parts being given effect and helping to interpret the others," and "a contract is restricted

---

[13] Indeed, given the Courts' rulings in *California Dairies,* UFW cannot plausibly argue that the allegations gave rise to "potential" coverage, because misrepresentation was neither an element to nor a cause of action raised by Cerritos.

to its evident object.  (Doc. 26 at 19, citing Cal. Civ. Code §§ 1641, 1648)  Hudson argues,

> It makes no sense to interpret the Wrongful Acts insuring words "includes, but is not limited to" as affording coverage for risks that are insured separately under a different coverage in the policy. The obvious purpose or object of the "Wrongful Acts" coverage is to afford the Union's directors and officers coverage for claims brought by union members for defalcations by the Union or its directors and officers in carrying out their duties *to the Union members*.

> Indeed, reading the Wrongful Acts coverage as extending to claims by employees for employment risks renders the "Wrongful Employment Practices" redundant and mere surplusage, in contravention of the fundamental rules of construction.

*Id.* at 20, citing *AIU Ins. Co.*, 51 Cal.3d at 827-828; *Helfand v. National Union Fire Ins. Co*., 10 Cal.App.4th 869, 891-892 (1992) (emphasis in original).

As Hudson observes, California courts prefer "an interpretation that gives effect to every clause… over one that would render other policy terms meaningless."  *See Mirpad, LLC v. California Ins. Guarantee Assoc*., 132 Cal.App.4th 1058, 1073 (2005); *see also AIU Ins. Co.*, 51 Cal.3d at 827-828 (declining to interpret a contract provision in a manner that causes another limitation "to be rendered meaningless); *Am. States Ins. Co. v. Ins. Co. of the State of Pennsylvania*, 305 F. Supp. 3d 1094, 1105 (E.D. Cal. 2018) (observing that under California law, "[f]undamental principles of insurance policy construction require that policy terms cannot be read in such a way that would render some of its words meaningless")  Because UFW's broad interpretation of "Wrongful Act" — to incorporate employee "misclassification"—would render the provision governing "Wrongful Employment Practices" meaningless, it must be rejected.  Thus, UFW fails to demonstrate Cerritos presented a claim covered under the Policy as a "Wrongful Act."

### C.    Material Misrepresentation

Under California law, an insurer is permitted to rescind a policy when a policyholder misrepresents a material fact on an insurance application. *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co*., 156 Cal. App. 4th 1259, 1266 (2007). The Insurance Code requires parties to an insurance policy to "communicate to the other in good faith, all the facts within his knowledge which are or which he believes to be material to the contract. *Id.* (quoting Cal. Ins. Code § 332)  If an insurance applicant makes a material misrepresentation, the insurance policy is void *ab initio*, and the Court treats the policy as if it never existed.  *LA Sound*, 156 Cal. App.4th at 1266. Under such

circumstances, an insurer cannot be liable for a breach of duty to defend or indemnify because the policy was never valid. *See id.*

### 1. Hudson's affirmative defense

As an initial matter, UFW contends Hudson may not raise the issue of any material misrepresentation its motion for summary judgment because misrepresentation was not plead as an affirmative defense in the Answer. (Doc. 35 at 23) UFW maintains such an affirmative defense has been waived because "[f]raud, or anything resembling fraud, is not included" as an affirmative defense. (*Id.*) UFW asserts that if Hudson were permitted to raise the affirmative defense, it would be prejudiced because "UFW has conducted no discovery on the matter of its alleged misrepresentation on the insurance application." (*Id.* at 24) According to UFW, "Had UFW learned through Hudson's answer that it stood accused of fraud, UFW would have sought discovery from [the] insurance agents" who submitted the application to Hudson. (*Id.*)

Significantly, Hudson's Fourteenth Affirmative Defense of "No Coverage" indicated: "There was no obligation for insurance coverage for all or part of the sums the plaintiff seeks, because coverage was precluded by the applicable insuring agreements, definitions, conditions, limitations and exclusions of Hudson's policy and/or by public policy or provisions of law." (Doc. 35-7 at 8) Under the terms of the insuring agreement, UFW agreed that "the statements in the application… are its representations, that they shall be deemed material, and that the policy [was] issued in reliance upon the truth of its representations." (Doc. 31-1 at 10) In addition, the Policy indicated that "[i]n the event that any statement in the application is untrue, this policy will be void with respect to any Insured Person who knew of such untruth *or* to whom such knowledge is imputed." (*Id.*, emphasis added) Further, on the signature page, which was executed by Arturo Rodriguez, president of UFW, the Policy indicated "the undersigned represent[ed], after inquiry, that to the best of his … knowledge and belief the statements set forth [in the application] are true, and he … [had] not withheld any information which is reasonably likely to influence the judgment of Hudson Insurance Company in considering this application…." (*Id.* at 29)

Because the Fourteenth Affirmative Defense indicates coverage was precluded by terms in the Policy—which included the requirement that representations in the application must be true or the

Policy would be voided—the Court finds the affirmative defense encompassed the misrepresentations identified in its motion for summary judgment.[14]

### 2. Postclaim underwriting

UFW asserts, "The court should not endorse the postclaim underwriting undertaken by Hudson…" (Doc. 35 at 24, emphasis omitted)  In general, postclaims underwriting occurs when an insurer waits until after a claim is made "to obtain information and make underwriting decisions which should have been made when the application [for insurance] was made, not after the policy was issued."  *See Hailey v. Cal. Physicians' Service*, 158 Cal. App.4th 452, 465 (2007).  UFW observes postclaim underwriting is "expressly outlawed for some kinds of insurance in California, in which the insurer determines the insured's eligibility for insurance after the insured suffers a loss rather than before offering a policy."  (Doc. 35 at 24)  For example, UFW observes that with health insurance, a California court described underwriting as "patently unfair" when an individual obtained a policy and paid the premiums, " only to learn after he submits a claim that he is not insured, and, therefore, cannot obtain any other policy to cover the loss."  (*Id.*, quoting *Hailey*, 158 Cal.App. 4th at 465)

However, as Hudson observes, "[t]he theory of 'post-claim underwriting' does not apply to commercial insurance. Decisions that have restricted an insurer's post-claim authority to rescind or limit coverage  apply only in the areas of disability, health and personal automobile insurance." (Doc. 39 at 13, citing *Colony Ins. Co. v. Crusader Ins. Co*., 188 Cal.App.4th 743 (2010)).  In rejecting the argument that an insurer could not engage in postclaim underwriting, the Colony Insurance court observed: "the relevant law requires an applicant for insurance to disclose material facts and permits rescission and other remedies absent such disclosure."  *Id.*, 188 Cal.App.4th at 756 (citing Ins. Code, §§ 331, 359; *Resure, Inc. v. Superior Court*, 42 Cal.App.4th 156, 161 (1996).  Thus, "California courts have been hesitant to extend [the] prohibition on postclaim underwriting] to other areas of insurance."

---

[14] Moreover, the Ninth Circuit has determined "[i]n the absence of a showing of prejudice, an affirmative defense may be raised for the first time at summary judgment." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir.1993) (citing *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir.1984)). Although UFW asserts it would be prejudiced, the potential discovery identified by UFW does not go to the claims or affirmative defenses presented in the complaint and answer.  Instead, as UFW tacitly acknowledges, such discovery would be related to a claim against its insurance agents.  Thus, the Court finds Plaintiff fails to demonstrate prejudice for any failure to specifically identify the misrepresentation in the Answer.

In addition, UFW's counsel admitted at the hearing that the plaintiff conducted *no* discovery as to the Fourteenth Affirmative Defense and, clearly, UFW made no effort through law and motion practice or otherwise to attempt to require Hudson to flesh out the defenses. Given this situation, if there is any prejudice—and the Court finds no evidence of this—it is prejudice of UFW perpetuated.

*See Unionamerica Ins. Co., Ltd. v. Fort Miller Group*, 2009 WL 688873 at *7 (N.D. Cal. Mar. 16, 2009) ("postclaim underwriting has been prohibited only in the context of some automobile insurance, and health insurance" and under California law, "the insured has the obligation to 'tell all it knows' about the risk, while the insurer has no obligation to investigate the accuracy or completeness of any of the information on the application") (internal citation omitted). Because postclaim underwriting is not prohibited under California law with commercial insurance, UFW's argument that Hudson's actions are improper, fails.

            **3.**      **Whether there was a misrepresentation**

The Policy application included the following underwriting questions related to UFW's litigation history and claims made against UFW:

> 6. Has the Union or any proposed Insured Person been involved in any civil or criminal action or litigation?
>
> 7. Has the Union or any proposed Insured Person been involved in or have knowledge of any inquiry, investigation, complain[t] or notice from any State or Federal Authority or Congressional or Legislative Committee regarding activities, procedures or practices of the Union, its members, officers, or employees?
>
> 8. Is any proposed Insured aware of any facts, circumstances or situations which may reasonably be expected to result in a claim under the proposed policy?

(Doc. 31-1 at 28) Each question was answered with "No." (*Id.*)

It is undisputed that UFW was, in fact, involved in civil litigation only months before it made its insurance application, because "UFW filed a lawsuit for breach of contract against Cerritos and others in the Monterey County Superior Court, *United Farm Workers of America v. La Union Es Para Todos Staff Union*." (DSF 16; Doc. 30-1 at 2) In addition, as indicated on the docket of the NLRB, "four unfair labor practices complaints… [were] filed against UFW with the National Labor Relations Board… in the year prior to the application." (*See* DSF 20) Despite initiating the action in the Monterey County Superior Court and the complaints with the NRLB, UFW indicated had not been involved in any civil litigation and had not been involved in any complaints with a federal authority "regarding activities, procedures or practices of the Union."

UFW submits declarations from its president, Arturo Rodriguez, who signed the insurance application; its secretary, Teresa Romero; and counsel, Mario Martinez. (Docs. 35-1 (Martinez Decl.),

35-3 (Rodriguez Decl.) and Doc. 35-4 (Romero Decl.)  In each of these declarations, UFW attempts to disavow knowledge of the misrepresentations made to Hudson, but UFW does not address the falsesity the information provided.  For example, Mr. Rodriguez asserts that at the application was submitted, he "did not consider that UFW was involved in any litigation" because the case against La Union and Cerritos "had effectively been resolved," and he "believe[d] that all answers given on the 2013 renewal application were correct."  (Doc. 35-1 at 2, ¶¶ 2-3)  In addition, Mr. Rodriguez reports he was "not contacted by anyone regarding any of the application questions."  (*Id.*, ¶ 4)  However, Mr. Rodriguez fails to address the fact that the application clearly questioned whether UFW has "*been* involved in *any* civil or criminal action or litigation," or federal inquiry not whether UFW was *currently* involved in litigation.  Mr. Rodriguez does not mention the NLRB complaints.  Thus, he fails to provide evidence to meet UFW's burden of production to raise a genuine issue of material  fact relate to the accuracy of the information provided.

Regardless, "an actual intent to deceive need not be shown." *Thompson v. Occidental Life*, 9 Ca1.3d 904, 915-916 (1973).  Under California law, "[a]n insurer has a right to know all that the applicant for insurance knows" with respect to the applicant's risk history. *See* Freeman v Allstate Life Ins. Co., 253 F3d 533, 536 (9th Cir 2001), quoting *Thompson*, 9 Ca1.3d at 915.  It is undisputed that UFW was involved in civil litigation and complaints made to the NLRB, which were not disclosed in response to the underwriting questions.  Thus, the UFW through Mr. Rodriguez misrepresentations in the application process.

### 4. Whether the misrepresentation was material

Under California law, materiality "is a subjective test;" the critical question is the effect truthful answers would have had on [Hudson] not on some 'average reasonable' insurer." *Imperial Cas. & Indem. Co. v. Sogomonian*, 198 Cal. App. 3d 169, 181 (1988).  Materiality is primarily determined by looking to "the probable and reasonable effect that truthful disclosure would have had on the insurer in determining the advantages of the proposed contract." *Merced Cty Mutual Fire Ins. Co. v California*, 233 Cal.App.3d 765, 772 (1991).

The Policy clearly indicated that "statements in the application… shall be deemed material and that [the] policy [was] issued in reliance upon the truth of such representations."  (Doc. 31-1 at 10)  In

addition, Hudson presents evidence from its underwriter, Justin Bove, which tends to show the significance of the omitted information. (Doc. 29 at 6, Bove Decl. ¶¶ 34, 35) UFW does not offer any evidence to the contrary. This evidence supports a conclusion that the misrepresentations were material. *See Mitchell v. United Nat. Ins. Co.*, 127 Cal. App. 4th 457, 474 (2005) (information is material to an application where it "would have caused the underwriter to reject the application, charge a higher premium, or amend the policy terms, had the underwriter known the true facts").

Furthermore, even without testimony from the underwriter, California law indicates that "[t]he fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law." *Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir. 2001), quoting *Thompson*, 9 Cal.3d at 915 (1973)). Because Hudson asked specific questions regarding UFW's litigation history, the information was material to the application. *See id.* (*see also* Doc. 31-1 at 10).

### E. Breach of the Covenant of Good Faith

UFW alleges a breach of the implied covenant of good faith and fair dealing in its Complaint. (Doc. 2-2) for which Hudson also seeks summary judgment (Doc. 26 at 29).

Under California law, "there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 400 (2000). To establish a claim for a breach of the implied covenant, a plaintiff must allege: "(1) the existence of a contract; (2) plaintiff performed all, substantially performed, or was excused from performing his obligations under the contract; (3) all conditions for defendant's performance occurred; (4) defendant unfairly interfered with plaintiff's right to receive the benefits of the contract; and (5) plaintiff was harmed by defendant's conduct." *Gonzalez v. First Franklin Loan Servs.*, 2010 WL 144862 at *17 (E.D. Cal. Jan. 11, 2010) (citation omitted)

Notably, there is no cause of action if there is no breach of contract—or even any contract. *See Waller v. Truck Ins. Exchange,* 11 Cal.4th 1, 36 (1995); *Gonzalez v. First Franklin Loan Servs.*, 2010 WL 144862 at *17 (E.D. Cal. Jan. 11, 2010). Because Plaintiff fails to establish the essential element of its claims, and the contract is void due to material misrepresentations in the application process,

summary adjudication of this claim is appropriate.

## VI.    Conclusion and Order

UFW fails to meet its burden to establish coverage under the terms of the Policy, and Hudson carries its burden to show an absence of a genuine issue of material fact related to Plaintiffs' claims. Accordingly, summary judgment is appropriate. *See Celotex,* 477 U.S. at 323.

Based upon the foregoing, the Court **ORDERS**:

1.    Plaintiff's motion for summary adjudication (Doc. 33) is **DENIED**;

2.    Defendant's motion for summary judgment (Doc. 26) is **GRANTED**; and

3.    The Clerk of Court is DIRECTED to enter judgment in favor of Defendant, Hudson Insurance Company and against Plaintiff, United Farm Workers of America.

IT IS SO ORDERED.

Dated:   __April 5, 2019__                        _____/s/ Jennifer L. Thurston__
                                                      UNITED STATES MAGISTRATE JUDGE